Laura Dilimetin (LD 4718)
LAW OFFICE OF STEVEN A. MORELLI
1461 Franklin Avenue
Garden City, New York 11530
P: (516) 393-9151
F: (516) 280-7528

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

**CV  14  4373**

AED, and JD, a minor, by his parent and natural
guardian JDD,

Docket No.:

**BROWN, M. J.**

**BIANCO, J.**

                         Plaintiffs,

        - against -

**VERIFIED
COMPLAINT**

CONNETQUOT CENTRAL SCHOOL DISTRICT,
CONNETQUOT CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION, LOUIS MALERBA,
individually and in his official capacity,
ALAN GROVEMAN, individually and in his official
capacity, DR. ALISON POPE, individually and in her
official capacity, DR. LISA IHNE, individually and in
her official capacity, ROBERT ANNUCCI,
individually and in his official capacity,
DONNA THOMPSON, individually and in her
official capacity, and TARA PHAFF individually and
in her official capacity,

**Jury Trial Demanded**

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   **JUL 18 2014**   ★

LONG ISLAND OFFICE

                         Defendants.
------------------------------------------------------------X

        Plaintiff JD, a minor, by his parent and natural guardian, JDD, by and through

their attorneys, THE LAW OFFICE OF STEVEN A. MORELLI, P.C., respectfully

alleges:

## PRELIMINARY STATEMENT

        1.      Plaintiff JD, is a ten year old boy who suffers from severe disabilities

including cerebral palsy with spastic quadriplegia and hypersensitive gag reflex. As a

result of his disabilities JD is unable to feed himself, toilet himself, or provide himself with the needs required for daily living. JD has been the target of continuous discrimination, harassment, neglect and bullying by Defendants on the basis of his disability.

2.     As more fully set forth below, in discriminating and retaliating against JD, Defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), Section 504 of the Rehabilitation Act of 1973, as amended, at 29 U.S.C. § 794 (the "Rehabilitation Act"), the Due Process Clause and the Equal Protection Clause of the 14th Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, the Individuals with Disabilities Education Act ("IDEA"), Article 89 of the New York State Education Law, and New York State Human Rights Law ("NYSHRL"), New York Exec. Law §§ 290 et seq., as well as assault and battery, negligence, and intentional infliction of emotional distress.

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 & 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

4.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 because (1) the Defendants are located in Bohemia, New York, which is located in the Eastern District of New York, and (2) the events which give rise to the Plaintiff's claims took place in Suffolk County, which is located in the Eastern District of New York.

## PARTIES

5.      Plaintiff JD, a minor by his parent and natural guardian JDD, is a ten year-old boy who is a resident and domiciliary of Suffolk County, New York.  JD suffers from cerebral palsy with spastic quadriplegia and hypersensitive gag reflex.

6.      Plaintiff AED, is the mother of JD, who is a resident and domiciliary of Suffolk County, New York.

7.      Defendant CONNETQUOT CENTRAL SCHOOL DISTRICT (the "District") is a municipal corporation incorporated under the laws of the State of New York, which is in charge of all public schools in Bohemia, New York, including the actions of its teachers, principals, superintendants, clerks and other employees of the Department of Education.  Its principal place of business is located at 780 Ocean Avenue, Bohemia, New York, 11716.

8.      Defendant CONNETQUOT CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION (the "Board") is a municipal corporation organized under and by virtue of the laws of the State of New York, with its principal place of business at 780 Ocean Avenue, Bohemia, New York, 11716.

9.      Defendant LOUIS MALERBA is an individual and is or was the Assistant Superintendent for Special Services of the Connetquot Central School District who is in charge of overseeing that the appropriate measures are taken to address all special services within the District. At all relevant times, Defendant Malerba was an employee and policymaker of Defendant District.  Upon information and belief Defendant Malerba is a resident and domiciliary of Suffolk County, NY.

3

10.     Defendant ALAN GROVEMAN is an individual and is or was the Superintendent of the Connetquot Central School District.  At all relevant times, Defendant Groveman was an employee and policymaker of Defendant District. Upon information and belief Defendant Groveman is a resident and domiciliary of Suffolk County, NY.

11.     Defendant DR. ALISON POPE is an individual and is or was the chairperson of the Committee on Special Education.  At all relevant times, Defendant Pope was an employee and policymaker of Defendant District. Upon information and belief Defendant Pope is a resident and domiciliary of Suffolk County, NY.

12.     Defendant DR. LISA IHNE is an individual and is or was the Principal of the Edward J. Bosti School.  At all relevant times, Defendant Ihne was an employee and policymaker of Defendant District. Upon information and belief Defendant Ihne is a resident and domiciliary of Suffolk County, NY.

13.     Defendant ROBERT ANNUCCI is an individual and is or was the District's Assistant Superintendent for Administration and Personnel.  At all relevant times, Defendant Annucci was an employee and policymaker of Defendant District. Upon information and belief Defendant Annucci is a resident and domiciliary of Suffolk County, NY.

14.     Defendant DONNA THOMPSON is an individual and is or was a member of the District's Special Education Department. At all relevant times, Defendant Thompson was an employee and policymaker of Defendant District. Upon information and belief Defendant Thompson is a resident and domiciliary of Suffolk County, NY.

4

15.     Defendant TARA PHAFF is an individual and is or was a physical therapist within the District.  At all relevant times, Defendant Phaff was an employee of Defendant District.  Upon information and belief Defendant Phaff is a resident and domiciliary of Suffolk County, NY.

## FACTUAL ALLEGATIONS

### Background

16.     JD is a ten year old boy with severe disabilities.  At a very early age, JD was diagnosed with cerebral palsy with spastic quadriplegia and hypersensitive gag reflex.  He requires a gastrostomy tube for feeding and hydration, cannot walk or stand, and has limited use of his hands and arms.  JD is confined to a wheelchair and/ or other adaptive equipment throughout the day.  He is unable to feed himself, toilet himself, or provide himself with the needs required for daily living.

17.     In September 2011, JD started attending the Edward J. Bosti School (the "School") in Bohemia, New York.  Notably, during the 2011-2012 and 2012-2013 academic years, he was the *only* wheelchair bound student attending the School.

18.     At the beginning of the 2011-2012 academic year, in order to accommodate JD's needs, the Connetquot Central School District (the "District") posted a Vacancy Notice for two hygiene aides; each with a three hour and forty-five minute daily shift, to assist JD in the School.  In the job description, the aides' sole responsibility was to "assist wheelchair bound students with hygiene and other basic needs during the school day" in the School.

19.    In September 2011, Defendants hired Ms. Linda Niles as a hygiene aide to provide individualized one-to-one ("1:1") care to JD, in conjunction with Ms. Julia Kaplan, JD's teaching assistant.

20.    Upon information and belief, rather than hiring another hygiene aide to fill the second vacant position, the District increased Ms. Niles hours from 3 hours 45 minutes daily to 6 hours daily to "accommodate child in wheelchair" as noted in the Board's Personnel Actions Sheet dated October 25, 2011.

### 2012-2013 Academic year

21.    During the 2012-2013 academic year, JD experienced numerous issues concerning his care.

22.    In September 2012, JD informed his parents that Ms. Niles was leaving him at various times during the school day.

23.    JD's father, Mr. D, immediately discussed the issue with Ms. Niles who advised him that she was assigned to care for several students, not just JD.

24.    Ms. Niles' daily assistance to other children was a clear violation of the Notice which required 1:1 hygiene care for JD. As such, Defendants violated JD's right to a free appropriate public education ("FAPE").

25.    In September 2012, Mr. D contacted Donna Smaldo, the secretary to Defendant Louis Malerba. Defendant Malerba is the Assistant to the Superintendant for Special Services in the District. Mr. D left a message complaining about Defendants' failure to provide JD with the 1:1 hygiene aide. Defendant Malerba never responded to his complaint.

6

26.    In or around October 2012, Mr. D. was advised by the Aides that they were given direct orders from Dr. Lisa Ihne, the Principal of the School, and Defendant Malerba, to cease all communication with Plaintiffs regarding their son's care. The Aides were threatened with punitive job reprimands and termination if they had any further communication with Plaintiffs.

27.    Mr. D. was stunned to hear that Defendants gave instructions that prohibited communication between his family and the Aides, given the severity of JD's disabilities and the responsibility of the Aides to provide care to JD. Clearly such directives were not in JD's best interest, as they were given without any justification and served to significantly impede the fluidity of his daily care.

28.    On October 9, 2012, Mr. D. informed Defendant Pope that JD was not receiving the services of a 1:1 hygiene aide that he was entitled to pursuant to the Notice.

29.    Defendant Pope responded that her documents did not reflect a 1:1 hygiene aide. However, Defendant Pope presided over the CSE Meeting and wrote the Notice which stated that JD was entitled to a 1:1 hygiene aide. Defendants were clearly in violation of the Notice and, thus, JD was deprived of an essential service that he was entitled to receive.

**Parents Take Action**

30.    On December 7, 2012, Mr. D. hand-delivered a copy of the Notice to Donna Smaldo in order to prove that JD was entitled to a 1:1 hygiene aide for both the summer of 2012 and the 2012-2013 academic year.

31.    At that time, Mr. D. made another verbal complaint to Ms. Smaldo regarding the 1:1 hygiene aide issue.

32.    Later that same day, Defendant Pope called Mr. D. to advise him that the 1:1 hygiene aide in the Notice was a "typo."

33.    Mr. D. then requested that Defendant Malerba call him to further discuss the matter; however Defendant Malerba failed to respond to his request once again.

34.    JD was: (1) provided with a 1:1 hygiene aide throughout the 2011/2012 academic year; (2) granted the service of a 1:1 hygiene aide for the 2012/2013 academic year and summer of 2012 during the CSE Meeting; (3) advised of said determination in the Notice; and (4) given the service of a 1:1 hygiene aide during the summer of 2012.

35.    It is clear that the 1:1 hygiene aide was granted and provided to JD until Defendants abruptly took the service away from him in September 2012.

36.    Defendants' sudden refusal to provide the 1:1 hygiene aide, without providing proper notice of such to Mr. and Mrs. D., served to deprive JD, a severely disabled child, of the services that he was rightfully entitled to receive, and compromised his overall safety in the School's environment.

37.    On March 1, 2013, Ms. Eileen Tyznar, the family's Parent Advocate, had a telephone conversation with Defendant Malerba, wherein she advised him that Defendants were in violation of both state and federal law in failing to adhere to the Notice which clearly entitled JD to a 1:1 hygiene aide.

38.    In response, Defendant Malerba exclaimed, "Wouldn't we all like somebody to wipe our butts?" This outrageous and offensive comment was heard by Ms. Tyznar, Mrs. D and Ms. Donna Cooley, a secretary in Ms. Tyznar's office.

39.    Later in the call, Ms. Tyznar made Defendant Malerba aware of her concerns regarding Defendant Phaff, JD's physical therapist. Specifically, Ms. Tyznar

questioned Ms. Phaff's ability to safely move JD given that she was several months

pregnant. Defendant Malerba responded by sarcastically stating, "well I guess we will

have to get a new physical therapist."

40.    At the conclusion of the conversation, Ms. Tyznar advised Defendant

Malerba that they would be filing a formal complaint with New York State.

41.    Upon information and belief, Defendants did not take any action to

address Ms. Tyznar's concerns.

### Defendants' Retaliation

42.    On March 6, 2013, Ms. Kaplan was questioned regarding her contact with

Mr. and Mrs. D, given Defendant Ihne's orders to cease all communication with JD's

parents.

43.    On March 11 and 12, 2013, Ms. Niles was instructed to leave JD and told

to remain in the nurse's office for the entire day for no apparent reason.

44.    On March 13, 2013, Mr. D. attended a meeting at the School wherein Ms.

Kaczorek, JD's teacher, advised him that Ms. Niles was unable to provide care for JD on

March 11-12, 2013 due to a "conflict."

45.    As stated above, JD was the only wheelchair bound student in the School

and, as set forth in the Vacancy Notice and the confirmation to increase Ms. Niles'

weekly hours, Ms. Niles' position was intended to "accommodate [a] child in [a]

wheelchair." Accordingly, Ms. Kaczorek's assertion, that there was a "conflict" with

JD's care, is inconsistent with true facts.

46.    Upon information and belief, Defendants' denial of Ms. Niles' care for JD

on March 11 and 12, 2013, was intended solely to harass and retaliate against Mr. and

Mrs. D, as well as JD, for stating their intention to file a formal complaint just one week prior.

### Instances of Negligent Care

47.     On April 3, 2013, JD was receiving physical therapy from Ms. Phaff while at the School. During the session, Defendant Phaff attempted to move JD by dragging him by his feet across the floor.  As a result, JD's feeding tube, which was left unprotected, became entangled in the mat and was forcefully ripped out by the unsafe handling of the therapist.

48.     JD was then brought to the nurse's office for immediate care. Unfortunately, the school nurse did not have the necessary medical equipment or requisite training by the School's administration to properly treat JD.

49.     Accordingly, due to Defendants' inability to handle JD's needs, Mr. D was contacted and asked to immediately come to the School in order to render the necessary medical treatment for JD.

50.     JD suffered a physical injury, was in tremendous pain and extremely upset as a result of this incident. However, said injuries could have been easily prevented, had Defendants properly trained its staff.

51.     Defendants' failure to take action to ensure JD's safety after being notified of the potentially dangerous situation on March 1, 2013 resulted in JD's injury.

52.     On April 11, 2013, Mr. D received another telephone call from the school nurse wherein she indicated that JD vomited all over his clothing due to an incident at lunch and asked Mr. D for assistance in handling the situation. In response, Mr. D

advised her that he provided the School with extra clothes for JD to wear in such circumstances and indicated that the Aides knew where to find them.

53.     The nurse then stated that neither Ms. Kaplan nor Ms. Niles were present. Given that Defendants were, yet again, unable to properly care for JD, Mr. D immediately came to the School to handle JD's needs.

54.     Upon his arrival to the School, Mr. D. was notified that an unfamiliar and untrained school employee had been assigned to assist JD in his feeding. It appeared that the aide's inexperience was the cause of the incident. As a result, JD suffered severe pain, was visibly distraught and had to be brought home early by Mr. D.

55.     Following the multiple experiences of mishandling, JD suffered from anxiety and a fear of going to school, which he discussed with his neurologist.

56.     Later that day, Mr. D. was informed by Defendant Ihne that Ms. Kaplan had been suddenly reassigned to a different school due to personnel matters.

57.     Mr. D. subsequently learned that Ms. Kaplan was suspended for two weeks without pay and transferred.

58.     Upon information and belief, the aforementioned suspension and transfer were in retaliation for Ms. Kaplan's communication with Mr. and Mrs. D.

59.     Defendant Ihne referred Mr. D to Defendant Robert Annucci, the Assistant Superintendent for Administration and Personnel, to discuss the issue in greater detail. Due to Mr. and Mrs. D's growing concerns, they requested a meeting with Defendant Annucci and Defendant Malerba to, yet again, address the issue of JD's hygiene aide and the abrupt removal of Ms. Kaplan.

**Filing of an Altered Notice**

60.     On April 11, 2013, Defendant Malerba filed an altered Prior Written Notice ("Revised Notice") with the District that was backdated to April 24, 2012. Significantly, in the Altered Notice, Defendant Malerba removed the service of a 1:1 hygiene aide.

61.     The Altered Notice did not have a stamp of revision and date, as is required when the document is changed.

62.     Defendants were clearly attempting to file the altered Revised Notice, without following the proper procedure, in order to introduce false information nearly a year after the original was written, to cover-up its mishandling and maltreatment of JD over the course of the 2012-2013 academic year.

63.     Defendant Malerba advised Mr. D. that he changed the original Notice to reflect the "discussions" which took place at JD's CSE meeting on April 24, 2012 (the "Meeting"); however, Defendant Malerba was not present at this CSE meeting and has no direct knowledge of what was discussed.

64.     Additionally, no discussions had taken place concerning the removal of the 1:1 hygiene aide at the Meeting, as evidenced by the Notice.

65.     In fact, Mr. and Mrs. D, upon learning of the sudden removal of the 1:1 hygiene aide from JD, have been unwavering in their vehement opposition to Defendants' unilateral change in JD's services and violation of the Notice.

66.     Notably, the mailing of the Revised Notice occurred on the same day that Ms. Kaplan was reassigned to a different school.

**JD becomes Ill Due to Defendants Maltreatment**

12

67.    On April 12, 2013, JD became extremely ill as a result of the incidents that had occurred over the prior week. He was brought to Dr. Margaret Fiumano, at his pediatrician's office, for an examination.

68.    Three days later, on April 15, 2013, JD's illness became worse and he was brought back to his pediatrician's office and examined by Dr. Eldose George.  At that time, Dr. George and Mr. D discussed the change in JD's aides and the inexperience of the new aides who were assisting JD at School.

69.    Dr. George concluded that the School was an unsafe environment for JD.

70.    JD remained sick for the next eleven days.

71.    On April 22, 2013, Dr. George wrote a letter to the School (the "Letter"), wherein he advised Defendants that JD should "receive educational services at his home until school staff can be trained accordingly to handle his unique physical needs" and recommended that a "personal nurse/qualified health professional be assigned to address his daily needs with the school to provide a safe environment."

**April 2013 Meeting**

72.    On April 22, 2013, Plaintiffs and Ms. Tyznar met with Defendant Annucci and Defendant Malerba at the District office.

73.    At the meeting, Plaintiffs inquired as to why Ms. Kaplan was suddenly reassigned from their son.  Defendant Annucci responded by saying "it had to be done" and refused to comment further.

74.    In light of the severity of the aforementioned injuries that JD suffered at the School, Plaintiffs questioned whether the Connetquot Central School District Board

13

of Education (the "Board") was advised of the aforementioned incidents and begged
Defendant Malerba to allow the Aides to assist JD in accordance with the Notice.

75.     Plaintiffs indicated that they were even willing to place JD in another
school or class to prevent "conflict" if it meant that they could receive the services of the
Aides.

76.     Despite Plaintiffs' plea Defendant Malerba refused to follow the Notice
and advised them to discuss their issues with the Board themselves.

77.     Furthermore, in a blatant attempt to intimidate Plaintiffs and Ms. Tyznar,
Defendant Malerba mentioned the special education services of another child for whom
Ms. Tyznar was assisting and touted that he "could always change his mind" about
granting that child special education services.

78.     Defendant Malerba's threat to needlessly deprive another child with
special needs of necessary services is indicative of his attitude towards disabled children
and willingness to abuse his authority to deny those children, including JD, of the
services they desperately need.  This is a systemic problem that is inherent in the District.

79.     On April 24, 2013, Defendants cancelled JD's CSE meeting that was
scheduled to take place on April 30, 2013.  No reason was provided for this cancellation.

### Plaintiffs Keep JD Home and File Complaints

80.     On April 25, 2013, JD had finally recovered from the incidents which
occurred on April 3, 2013 and April 11, 2013. However, JD began to suffer severe
anxiety and was unable to attend school as a result of Defendants' actions which placed
JD in an unsafe environment.

14

81.    On April 25, 2013, Mr. D. hand-delivered the Letter to the School and advised the School of his intention to keep JD home in accordance with his Dr. George's recommendation and requested home tutoring.

82.    Plaintiffs were later notified, on May 10, 2013 that the CSE approved JD's request for home tutoring.

83.    On April 26, 2013, Mr. and Mrs. D. filed a complaint with the New York State Education Department (the "NYSED").

84.    On April 29, 2013, Mr. and Mrs. D. filed a complaint with the Board as well as a second complaint with the NYSED.

85.    On May 1, 2013 Mr. D. received a telephone call from Andrea Wilson, the District Clerk at the School, informing him the Board had received his complaint and is investigating the matter. Later that same day, Defendant Malerba spoke with Mr. D. on the phone wherein and told him that Dr. Alan Groveman, the superintendent of the District, agreed to provide JD with a 1:1 hygiene aide for the remainder of the academic year but continued to deny JD the services of his trained teaching assistant.

86.    Defendant Malerba advised that a decision regarding the teaching assistant would be made when Defendant Annucci, Assistant Superintendant for Administration and Personnel, returned from sick leave.

87.    Although Defendant Malerba stated that Plaintiffs would promptly receive written confirmation of Defendants' decision to grant the 1:1 hygiene aide by mail, Defendants did not send the written decision or contact Plaintiffs concerning JD's care until May 14, 2013, when Defendant Malerba left a telephone message for Mr. and Mrs. D.

**Further Retaliatory Action**

88.     On May 13, 2013, Plaintiffs received a note from Defendants stating that JD's sister, VD was not allowed to ride the school bus with her friends on an upcoming class trip because she missed the deadline to hand in money for the trip.

89.     Notably, on May 9, 2013, V.D.'s teacher called Mrs. D. to inquire as to whether VD was attending the school trip, as VD was absent from school on the day that the trip money was due. Ms. D. responded that VD wanted to attend the trip and would bring in her trip money upon her return to school. VD's teacher confirmed that would not be a problem. However, despite their conversation, Defendants refused to allow VD to ride the school bus on the class trip.

90.     Defendants' actions were purely retaliatory and intended to harass Plaintiffs' family as a result of their filing of NYSED complaints against the District. As a result, Mrs. D had to drive her daughter to and from the class trip. She was the only child who was not allowed on the Connetquot bus.

91.     On May 14, 2013, Mr. D attempted to speak with Defendant Malerba and Defendant Groveman in person at the district office but was told that they were unavailable. Later that afternoon, Defendant Groveman called Mr. D to advise him that the School would provide JD with 1:1 hygiene aide for the remainder of the 2012-2013 academic year as well as the entire 2013-2014 academic year, and stated that he was

unaware of the reason for the reassignment of Ms. Kaplan, JD's trained teaching assistant.

92.     Defendant Groveman indicated that he would investigate the issue concerning the trained teaching assistant. During the conversation, Mr. D informed Defendant Groveman of the criminality of Defendant Malerba's actions to which he had no response.

93.     On May 17, 2013, Mr. and Mrs. D received a letter from Donna Thompson, wherein the District cancelled their youngest son's upcoming CSE meeting. Upon information and belief, the District's sudden cancellation of the CSE meeting was retaliatory and intended to further harass Plaintiffs.

94.     Furthermore, the letter was hand-delivered by the School's janitor, which is a violation of the Family Education Rights and Privacy Act ("FERPA"), as the school must have written permission to release any information from a student's educational record. The District directly violated FERPA by allowing the janitor to deliver the mail at JD's home.

95.     Further, upon information and belief, Defendant Malerba directed Defendant Pope to improperly eavesdropped on a confidential communications of JD's parents regarding JD's doctor at CSE meetings. When confronted with these claims, Defendants denied it and told blatant untruths.

96.     On May 20, 2013, Mr. D filed a complaint with the New York State Attorney General's Office concerning Defendant Malerba's actions.

97.     The very next day, Mr. D received a letter from Dr. Groveman, which was hand-delivered to the family's residence by a School security guard at 5:00 PM, wherein

17

Defendant Groveman threatened to contact Suffolk County Child Protective Services ("CPS") if JD did not return to school by May 24, 2013.

98.   Mr. D has reported these violations of FERPA, and there is currently a federal investigation underway.

99.   Significantly, May 24, 2013 was the last business day for the District to produce documents to NYSED in connection with Mr. D's complaint against Defendants.

100.   In selecting the May 24, 2013 deadline Defendants were attempting to further its own interests. In the event that JD had returned to School on May 24, 2013, the District could have avoided the production of documents to NYSED, advised NYSED that the matter had been resolved and caused the investigation to be closed without further action.

101.   On May 23, 2013, Plaintiffs received a revised IEP from the District for the 2012-2013 academic year. Although the IEP indicated that JD was entitled to receive a 1:1 hygiene aide, the IEP did not specify that the aide was required to provide care only to JD during each school day for a continuous period of six hours. Rather, the IEP stated the frequency of the 1:1 hygiene aide was "as required" and noted that the duration was "throughout the school day." In contrast, the frequency of the teaching assistant's care was listed as "1x daily" for the duration of "6 hours." In addition, the IEP was not properly dated or stamped as being a "revised" version.

102.   On May 24, 2013, despite Defendants' knowledge of the aforementioned incidents wherein JD was physically injured as a result of the District's unsafe environment and failure to take action to prevent further injury, Defendants contacted

Child Protective Services ("CPS") as a result of JD's doctor-recommended absence from School.

103.     In contacting CPS, and reporting Mr. and Mrs. D, Defendants were retaliating against Plaintiffs' family for filing complaints against the District. Accordingly, on July 8, 2013, CPS concluded that the allegations of child abuse or maltreatment against Mr. and Mrs. D were unfounded.

104.     On June 28, 2013, NYSED issued its findings concerning the investigation of the State complaint filed by Mr. D on April 30, 2013 alleging violations of federal and state laws.

105.     NYSED concluded that the District failed to provide JD with services of a 1:1 hygiene aide, as recommended by the CSE for the 2012-2013 academic year, and also failed to provide Prior Written Notice before the District changed the 1:1 hygiene aide provision.

106.     During the 2013-2014 academic year, JD's parents were told that he would be able to mainstream into classes involving art and music, this was documented in his most recent IEP.  However, Defendants denied JD entrance into higher functioning art and music classes.

107.     JD has been the target of continuous discrimination, harassment, neglect, and bullying by Defendants on the basis of his disability. Defendants' ongoing failure to properly address the aforementioned issues has resulted in JD's immense suffering, both physically and emotionally.  Moreover, Defendants embarked on a systematic campaign of blatant retaliation following JD's parents' good faith complaints and opposition to discriminatory practices.

108.    The wrongs alleged here would not have been corrected by resort to the administrative hearing process because Defendants failed to implement services that were specified or otherwise clearly stated in the Prior Written Notice.

109.    Furthermore, upon information and belief, the District has a history of denying children with disabilities proper care. For years the District has intermingled funds and used money allocated to special education for other purposes. There are systemic violations associated with the District's care of disabled children.

110.    Even if the administrative process was exhausted, the same sort of personnel jockeying, cost-cutting, money moving tactics would have been employed by the District, leading to IEP violations for JD as well as other children with disabilities. In cases of repeated failures to implement services and systemic violations of IDEA, the United States District Court for the Second Circuit has held that exhaustion of administrative remedies is not required, because plaintiffs' efforts would be futile. As such, the administrative hearing process would is futile.

**CLAIMS FOR RELEIF**

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Violation of the IDEA)**

111.    Based on the foregoing, as correctly concluded by the NYSED, the District failed to provide JD with the services of a 1:1 hygiene aide, as recommended by the CSE for the 2012-2013 academic year. The District also failed to provide Plaintiffs with Prior Written Notice before unilaterally changing the 1:1 hygiene aide provision.

112.    Over the course of the 2012-2013 academic year, Defendants failed to implement the services that were specified in Defendant Pope's Prior Written Notice of April 24, 2012. In failing to adhere to the recommended 1:1 hygiene aide provision,

Defendants denied JD of his right to a Free Appropriate Public Education ("FAPE"), in violation of the IDEA, 20 U.S.C. § 1400 et seq.

113.    In denying JD a FAPE, in violation of the IDEA, Defendants acted to intentionally deprive Plaintiffs' of their statutory rights, and with the requisite deliberate indifference to Plaintiffs' constitutional rights.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Violation of New York State Education Law)

114.    Based on the foregoing, as correctly concluded by the NYSED, the District failed to provide JD with the services of a 1:1 hygiene aide, and the District also failed to provide Plaintiffs with Prior Written Notice before unilaterally changing the 1:1 hygiene aide provision.

115.    Over the course of the 2012-2013 academic year, Defendants failed to implement the services that were specified in Defendant Pope's Prior Written Notice of April 24, 2012, denying JD of his right to a Free Appropriate Public Education ("FAPE"), in violation of the N.Y. Education Law, Article 89, § 4400 et seq.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Disability Discrimination)

116.    Based on the foregoing, JD is a qualified individual with a disability, as defined by the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.

117.    Defendant District receives federal funds from the U.S. government, and is therefore subject to the legal requirements of the ADA and the Rehabilitation Act.

118.    Plaintiffs requested reasonable accommodations relating to JD's disability, which was necessary and not overly burdensome on the District.

119.    Despite approving Plaintiffs' requested disability related accommodations during the April 24, 2012 CSE Meeting, Defendants failed to implement the proposed accommodations during the 2012-2013 academic year, as well as refused to let JD into art and music classes. Defendants failed to implement the required accommodations despite repeated attempts.

120.    JD was denied said accommodations and educational benefits solely by reason of his disability, and otherwise intentionally discriminated against by Defendants on the basis of his disability, in violation of the ADA, Section 504 of the Rehabilitation Act of 1973, New York Executive Law § 290 et seq.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Retaliation)

121.    Based on the foregoing, JD is a qualified individual with a disability, as defined by the ADA and Section 504 of the Rehabilitation Act.

122.    Plaintiffs herein engaged in protected activity by: (1) requesting reasonable accommodations on behalf of their minor child; and (2) filing complaints with the New York State Education Department and the New York State Attorney General's Office.

123.    Defendants had knowledge that Plaintiffs engaged in said protected activity.

124.    Following Plaintiffs' protective activity Defendants intentionally took adverse actions against Plaintiffs solely for purposes of harassment and intimidation, by: (1) directing the Aides to cease all communication with JD's parents; (2) ordering Ms. Niles to leave JD unattended for an entire day; (3) refusing to permit VD to attend a field trip on the same bus as her classmates; (4) suspending and transferring Ms. Kaplan to

another school; (5) assigning untrained aides to care for JD, thereby exposing him to an unsafe learning environment where he was repeatedly injured; and (6) filing a baseless complaint with Child Protective Services against Mr. and Mrs. D.

125.    In retaliating against Plaintiffs because of their good faith opposition to discriminatory practices, Defendants violated the ADA, Section 504 of the Rehabilitation Act, and New York Exec. Law § 290 et seq.

### AS AND FOR A FIFTH CAUSE OF ACTION
#### (Substantive Due Process)

126.    Based on the foregoing, Defendants, while acting under color of state law, intentionally took unreasonable, arbitrary and capricious action against Plaintiffs, employing their authority as an instrument of oppression.  Specifically, but not limited to denying JD an appropriate special education of which he was entitled

127.    Defendants, while acting under the color of law, discriminated against Plaintiff on the basis of his disability.  Such mistreatment violated the Due Process Clause to the 14th Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983. Defendants are liable for the deprivation of Plaintiff's rights because such acts were taken in accordance with the Defendants' custom or practice of discriminating and/ or selectively treating individuals; these practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers; and, the individual policymakers, including Defendant Malerba, Defendant Groveman, Defendant Pope, Defendant Ihne, and Defendant Annucci, directly participated in and/ or tacitly condoned the discrimination to which Plaintiff was subjected.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Equal Protection)

128.    Based on the foregoing, Defendants selectively treated, and intentionally discriminated against JD on the basis of his disability, and on the basis of Plaintiffs' complaints, with the clear intent on punishing and injuring Plaintiffs, exhibiting bad faith and malicious intent.    Specifically, but not limited to, Defendants treating JD with disparate treatment, and denying JD entrance into art and music classes based on his disability.

129.    Defendants, while acting under the color of law, discriminated against Plaintiff on the basis of his disability.  Such mistreatment violated the Equal Protection Clause to the 14th Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983.  Defendants are liable for the deprivation of Plaintiff's rights because such acts were taken in accordance with the Defendants' custom or practice of discriminating and/ or selectively treating individuals; these practices were so persistent and widespread that they constitute the constructive acquiescence of policymakers; and, the individual policymakers, including Defendant Malerba, Defendant Groveman, Defendant Pope, Defendant Ihne, and Defendant Annucci, directly participated in and/ or tacitly condoned the discrimination to which Plaintiff was subjected.

## AS AND FOR AN SEVENTH CAUSE OF ACTION
### (Assault and Battery)

130.    Based on the foregoing, Defendant Phaff, while acting pursuant to her official duties as an employee and agent of Defendant District, intentionally dragged JD by his feet, causing JD's feeding tube to become entangled and forcefully ripped out.

24

This forceful, offensive, and harmful contact constitutes battery under New York State common law.

131.    Defendant District is therefore vicariously liable for the battery committed by Ms. Phaff under the doctrine of respondeat superior.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Negligence)

132.    Based on the foregoing, Defendants owed JD, a student in the District, a special duty of care.

133.    Defendants failed to take all reasonable steps to reduce risk of injury and harm to JD, by failing to train its employees, and not supplying the proper aid and care.

134.    Defendants breached its duty to JD, including but not limited to, when Defendants' employee dragged JD by his feet forcibly ripping out his feeding tube.

135.    As a result of its material breach, proximately caused JD physical and emotional damages, which were reasonably foreseeable.

136.    As such, Defendant District is liable for negligence, under New York State common law.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Negligence Per Se)

137.    Based on the foregoing, Defendants are Negligent Per Se.

138.    As defined by the Dignity for All Students Act (DASA), NY Education Law § 10 et. seq, the District owed GM a special duty of care to supervise the activities of the District's employees and members of the District's student body, so as to prevent the occurrence and perpetration of acts of bullying, cyber bullying, harassment and violations of civil rights by employees and students upon GM.

25

139.    The purpose of DASA is to foster civility in public schools and to prevent and prohibit conduct which is inconsistent with a school's educational mission.  It is now the policy of the state and a statutory duty of care to afford all students in public schools an environment free of discrimination and harassment.

140.    This duty is further explained by the Dignity for All Students Act (DASA), NY Education Law § 10 et. seq. that was passed in 2010.  DASA defines "Harassment" and "bullying," on or off school grounds, as "the creation of a hostile environment by conduct or by threats, intimidation or abuse, including cyberbullying, that (a) has or would have the effect of unreasonably and substantially interfering with a student's educational performance, opportunities or benefits, or mental, emotional or physical well-being; or (b) reasonably causes or would reasonably be expected to cause a student to fear for his or her physical safety; or (c) reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student." NY Educucation Law § 11.

141.    DASA also requires school employees who witness harassment, bullying or discrimination, or receive an oral or written report of harassment, bullying or discrimination, to promptly orally notify the principal, superintendent or the principal's or superintendent's designee not later than one school day after such school employee witnesses or receives a report of harassment, bullying or discrimination, and to file a written report with the principal, superintendent or the principal or superintendent's designee not later than two school days after making such oral report. After an immediate investigation the principal must take prompt actions reasonably calculated to eliminate any hostile environment, and create a safe learning environment for the child.

142.    Defendants knew or should have know that JD was the target of harassment and civil rights violations perpetrated by members of the administration, including but not limited to Defendant Malerba, Defendant Pope, and Defendant Groveman. .

143.    Defendants failed to take all reasonable steps to reduce risk of injury and harm to JD, by failing to develop adequate strategies to adequately protect JD from his abusers.  By reason of the foregoing, Defendants were negligent in failing to address known instances of harassment and violations of JD's civil rights.

144.    Defendants failures were a breach of their statutory duty owed to JD.  As a result of the Defendants breach of duty, JD suffered physical and emotional harm from harassment and violations of his civil rights to the point where he no longer felt safe in school.

145.    Defendants are liable of Negligence Per Se, as JD has suffered from harassment and violations of his civil rights, the types of harm sought to be eliminated by the statute, and JD is a student, the class sought to be protected by the statute.

### AS AND FOR AN TENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

146.    Based on the foregoing, Defendants herein acted with a disregard to the substantial likelihood of causing severe emotional distress to JD and AED in: (1) denying JD the accommodation and services which were necessary and recommended; (2) removing JD's trained Aides and replacing them with poorly trained paraprofessionals who were ill equipped to provide proper care for JD; and (3) retaliating against JD and his parents for their good faith complaints and opposition to discriminatory practices. Defendants actions were intended solely to harass, intimidate, and punish Plaintiffs, and

were committed in bad faith, with the malicious intent to cause Plaintiffs severe emotional distress.

147.    Defendants actions complained of herein constitute extreme and outrageous conduct that exceeds all bounds tolerated by society.

148.    Defendants are liable for Intentional Infliction of Emotional Distress under New York State common law.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

149.    Based on the foregoing, Defendants conduct herein was extreme and outrageous.  Defendants conduct endangered JD's physical safety, and caused him to fear for his safety when attending school.

150.    JD was anxious about attending school and suffered emotionally as a result.  Defendants are therefore liable for Negligent Infliction of Emotional Distress under New York State common law.


**WHEREFORE,** Plaintiff demands judgment against Defendants for all compensatory, emotional, psychological and punitive damages, and any other damages permitted by law pursuant to the above reference causes of action, as well as injunctive relief.  It is further requested that this Court grant reasonable attorney's fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.

1.    Awarding reasonable attorneys' fees and the costs and disbursements of this action; and

2.    Granting such other and further relief that the Court deems just and proper.

28

**Further,** Plaintiff demands a trial by jury.


Dated: Garden City, New York
    June 25, 2014

    Respectfully Submitted,


    Laura Dilimetin (LD4718)
    **THE LAW OFFICE OF STEVEN A. MORELLI, P.C.**
    1461 Franklin Avenue
    Garden City, New York 11530
    P: 516.393.9151
    F: 516.280.7528


29

## VERIFICATION

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF Suffolk    )

      AED, being duly sworn, states that she has reviewed the foregoing **Plaintiff's Verified Complaint** and that the contents of said are true to her own knowledge, except as to matters therein stated to be alleged upon information and belief and, as to those matters, she believes them to be true.

*Amy E. Douglas*
AED

Duly sworn to before me
this 20 day of June 2014

NOTARY PUBLIC

ANGELICA RIOS CRUZ
Notary Public State of New York
No. 01RI6225682
Qualified in Suffolk County
Commission Expires July 26, 2016

<u>VERIFICATION</u>

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF Suffolk    )

       JDD, being duly sworn, states that he has reviewed the foregoing **Plaintiff's Verified Complaint** and that the contents of said are true to his own knowledge, except as to matters therein stated to be alleged upon information and belief and, as to those matters, he believes them to be true.

JDD

Duly sworn to before me
this 20 day of June 2014

NOTARY PUBLIC

ANGELICA RIOS CRUZ
Notary Public State of New York
No. 01RI6225682
Qualified in Suffolk County
Commission Expires July 26, 2014